1 | J. Russell Stedman (117130), rstedman@bargerwolen.com
Travis R. Wall (191662), twall@bargerwolen.com
2 | Peter J. Felsenfeld (260433), pfelsenfeld@bargerwolen.com
BARGER & WOLEN LLP
3 | 650 California Street, 9th Floor
San Francisco, California 94108-2713
4 | Telephone: (415) 434-2800
Facsimile: (415) 434-2533

5

Attorneys for Defendant
6 | New York Life Investment Management LLC

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO DIVISION

11

12

| | |
|---|---|
| TERRA INSURANCE COMPANY (A Risk Retention Group), | CASE NO. C 09-01609 WHA |
| Plaintiff, | **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| NEW YORK LIFE INVESTMENT MANAGEMENT LLC, | **FRCP 56** |
| Defendant. | **Date:** **May 6, 2010** |
| | **Time:** **8:00 AM** |
| | **Courtroom 9, 19th Floor** |
| | **The Honorable William Alsup** |

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

# TABLE OF CONTENTS

PAGE

1. **INTRODUCTION** ...................................................................................................................1

2. **STATEMENT OF ISSUES TO BE DECIDED** ...................................................................2

3. **STATEMENT OF FACTS**......................................................................................................3

    A.    The Parties' Investment Advisory Agreement.................................................................3

    B.    Terra Always Followed a Long-Term Buy and Hold Strategy........................................4

    C.    The Sale of Third-Party Mutual Funds ..........................................................................5

    D.    The November 2007 Board Meeting ...............................................................................5

    E.    Terra Obtains Asset Allocation Information from Multiple Sources................................7

    F.    The March 2008 Board Meeting......................................................................................7

    G.    The Severe Stock Market Downturn in Late 2008..........................................................8

    H.    Terra Sues Based on False Allegations about the Quality Tilt Program .........................9

        (1)    New York Life's Quality Tilt Program did Not Involve NYL Investments' Assets......................................................................................................................9

        (2)    The Quality Tilt did Not Concern Equities ..........................................................10

        (3)    NYL Investments did Not Conceive of or Recommend the Quality Tilt.............10

        (4)    Terra's Investment Advisors Did Not Work on New York Life's Account or Receive Information Regarding the Quality Tilt ..............................................11

4. **DISCUSSION**........................................................................................................................11

    A.    New York Life and NYL Investments are Separate Entities and Must be Treated as Such ..........................................................................................................................11

    B.    NYL Investments has no Duty to Disclose the Investment Opinions or Strategies of One Client to Another................................................................................................12

    C.    NYL Investments Representatives had No Legal Duty to Seek and Obtain Information About New York Life's Investment Strategies when Responding to Terra's Inquiry .............................................................................................................13

        (1)    NYL Investments Never Agreed to Provide Such Information and Terra Never Expressed any Interest in New York Life's Investment Strategies ...........13

        (2)    Requiring Advisors to Account for the Investment Strategies of Affiliated Companies would Conflict with the Advisor's Duty to Provide Independent Advice Based on Each Client's Circumstances................................14

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

i

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

D. There was no Failure to Disclose Material Facts .............................................................. 15

E. NYL Investments' Statements about the Economy were not Actionable ...................... 18

   (1) There is No Evidence of Knowingly False Statements ........................................ 18

   (2) Sabella and Knapp had Reasonable Grounds for Their Opinions ........................ 18

   (3) Terra Could Not Justifiably Rely Upon Opinions about the Economy ................ 19

F. NYL Investments is Entitled to Judgment as a Matter of Law against Terra on Each Claim for Relief .......................................................................................................... 19

   (1) The Fraudulent Misrepresentation Claim ............................................................. 19

   (2) The Intentional Concealment Claim ...................................................................... 19

   (3) The Negligent Misrepresentation Claim ............................................................... 20

   (4) The Breach of Fiduciary Duty Claim .................................................................... 20

   (5) The Breach of Contract and Implied Covenant Claims ........................................ 22

   (6) The Negligence Claim ............................................................................................ 22

G. Defendants are Entitled to Judgment as a Matter of Law on the Punitive Damages Claim .............................................................................................................. 22

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

ii

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES

2

PAGE

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................................23

*Fraker v. Sentry Life Ins. Co.,*
  19 Cal. App. 4th 276 (1993) ...................................................................................................19

*Friedman v. Merck & Co.,*
  107 Cal. App. 4th 454 (2003). ...............................................................................................20

*In re Angelica P.,*
  28 Cal. 3d 908 (1981) .............................................................................................................22

*Ladd v. County of San Mateo,*
  12 Cal. 4th 913 (1996) ............................................................................................................22

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F. 3d 940 (9th Cir. 2005) .................................................................................................15

*Lovejoy v. AT & T Corp.,*
  119 Cal. App. 4th 151 (2004) .................................................................................................20

*Lynch v. Cook,*
  148 Cal. App. 3d 1072 (1983) ................................................................................................15

*McCormick v. Fund Am. Colonies, Inc.,*
  26 F.3d 869 (9th Cir. 1994) ....................................................................................................15

*Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells,*
  86 Cal. App. 4th 303 (2000). ..................................................................................................19

*Parrish v. National Football League Players Ass'n,*
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) .................................................................................22

*Underwriters Clearing House v. Natomas Co.,*
  184 Cal. App. 3d 1520 (1986) ................................................................................................15

**Statutes**

Cal. Civ. Code § 3294(a) ............................................................................................................22

**Other Authorities**

*In the Matter of Alfred C. Rizzo*, Advisors Act Release No. 897 (Jan. 11, 1984) ..........................14

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

iii

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that on May 6, 2010, at 8:00 AM, in Courtroom 9, 19th Floor, of

3    the above court, Defendant ("NYL Investments") will move pursuant to F.R.C.P. 56 for summary

4    judgment or, in the alternative, partial summary judgment against Plaintiff ("Terra"). Defendant's

5    motion is made on the grounds that, based on the undisputed facts and applicable law, there is no

6    triable issue of material fact and Defendant is entitled to summary judgment as a matter of law.

7      If the Court does not grant summary judgment, Defendant moves, in the alternative, for

8    partial summary judgment finding for Defendant on: 1) the fraudulent misrepresentation claim; 2)

9    the fraudulent concealment claim; 3) the negligent misrepresentation claim; 4) the breach of

10   fiduciary duty claim; 5) the breach of contract claim; 6) the breach of the implied covenant claim; 7)

11   the negligence claim; and/or 8) the punitive damages claim.

12     This motion is based on this Notice of Motion, Memorandum of Law in Support;

13   Declaration of Travis R. Wall; Request for Judicial Notice; all pleadings, records and papers on file

14   in this action; and upon such oral and documentary evidence that may be presented at hearing.

15

**MEMORANDUM OF LAW**

16

**1.      INTRODUCTION**

17     Terra's case is an improper attempt to hold NYL Investments liable for not telling Terra

18   about an investment strategy – the "Quality Tilt" – conceived of and employed by another client,

19   New York Life Insurance Company ("New York Life"). NYL Investments was Terra's investment

20   advisor. Terra expressed concerns about the U.S. economy and asked whether it should sell all of

21   its equity investments. Terra claims NYL Investments was obligated to respond with information

22   about New York Life's Quality Tilt program. NYL Investments had no legal duty to disclose this

23   or any information about New York Life or any other client. Terra's Investment Advisory contract

24   does not create any such obligation, nor did the parties' course of dealing – Terra never even asked

25   for New York Life's investment opinions or strategies. Even if Terra had done so, NYL

26   Investments was not free to share this information.

27     Like every client in an investment advisory relationship, New York Life was entitled to

28   confidentiality of its investment strategies and communications with its investment advisor. Its

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   contract with NYL Investments includes an express provision requiring such information be kept

2   confidential.  There is no exception to the duty of confidentiality NYL Investments owed to

3   New York Life, and this duty is not diminished by New York Life's status as NYL Investments'

4   ultimate parent company.  NYL Investments and New York Life are separate legal entities.  Terra

5   has no right to confidential New York Life information and NYL Investments owed Terra no duty

6   to share that information.

7        Terra has grossly misrepresented the Quality Tilt in an attempt to bypass this barrier and link

8   the program to its query about whether to sell all of its equities.  Contrary to Terra's allegations, the

9   Quality Tilt did not concern NYL Investments' assets and was not conceived of or even

10   recommended by NYL Investments.  The Quality Tilt was a strategy developed internally at

11   New York Life for its fixed income asset portfolio.  The Quality Tilt did not involve equities or

12   forecasting about the future of the stock market – the question raised by Terra.

13        Terra's distortion of the Quality Tilt underscores the weakness of its claims.  Terra was

14   given substantial information about the relevant market conditions and NYL Investments'

15   independent opinions.  Terra cannot seize upon statements made by New York Life in *its* Annual

16   Report to claim, with the benefit of hindsight, that knowing what *New York Life* thought and did

17   with its fixed income investments would have caused Terra to liquidate its entire equity portfolio.

18   Even if NYL Investments did not have the duty to keep New York Life's information confidential,

19   no reasonable investment adviser would have believed the Quality Tilt was relevant.  The

20   information also was immaterial as a matter of law.  No reasonable, long-term investor would have

21   decided to liquidate its equity portfolio based on New York Life's Quality Tilt program.

22           **2.**    **STATEMENT OF ISSUES TO BE DECIDED**

23       -Whether NYL Investments had any duty to disclose the confidential

24       investment strategies of one client to another client.

25       -Whether NYL Investments had a duty, in response to Terra's inquiry about

26       the economy and stock market, to obtain information about New York Life's

27       opinions and investment strategies and disclose that information to Terra.

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

2

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   -Whether knowledge of New York Life's opinions about credit market

2   conditions nearly a year before Terra claims it would have liquidated its equities, and

3   New York Life's adjustment within its fixed income portfolio, would have been

4   substantially likely to cause a reasonable, long-term institutional investor to liquidate

5   its entire equity portfolio, given all facts and circumstances.

6   -Whether an investor can prove reliance based upon statements of opinion

7   about the subjects of future economic conditions and stock market performance.

### 3.   STATEMENT OF FACTS

#### A.   The Parties' Investment Advisory Agreement

10   Terra is a professional liability insurer providing casualty insurance to engineering firms. In

11   1989, Terra entered into an Investment Advisory Agreement ("Agreement") with Towneley Capital

12   Management, Inc. ("Towneley"). Wall Decl., Ex. 1.[1] Wes McCain and Joan Sabella of Towneley

13   were Terra's portfolio managers. Ex. 72 at 69:1-17 (Coduto). In October 2000, McCain and

14   Sabella joined NYL Investments, and Terra consented to the assignment of the Agreement to

15   NYL Investments. Ex. 2. In 2004, McCain left NYL Investments. Sabella continued to advise

16   Terra. Ex. 72 at:70:14-71:22 (Coduto).

17   NYL Investments is a registered investment adviser that provides asset management and

18   advisory services to a variety of clients. NYL Investments provides a broad array of investment

19   advisory services to entities, including, but not limited to affiliated companies, such as New York

20   Life, third-party institutional clients like Terra, investment companies, and mutual funds. Ex. 60 at

21   TERRA 005348.

22   The Agreement gave NYL Investments express authority to manage Terra's account in

23   accordance with written investment guidelines attached as Exhibit A. Ex. 1. The guidelines could

24   only be changed by Terra's Board of Directors. Ex. 76 at 53:13-54:19 (Withiam). Until Terra and

25   NYL Investments agreed in writing upon changes to the guidelines, NYL Investments was

26   "authorized to pursue the objectives set out in Exhibit A." Ex. 1.

27

28   ─────────────

[1] Except as noted, all references to exhibits refer to the exhibits attached to the Wall Declaration.

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

3

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   The relevant guidelines were approved in November 2005. Ex. 8 at TERRA 005334;

2   Complaint ¶ 31. Those guidelines specified an objective of "Preservation of Capital in nominal

3   terms and interest income," and provided that the "objective seeks a balance between the capital

4   risks associated with equity mutual funds/products and the risks of loss of purchasing power that

5   may result from holding fixed income securities during prolonged periods of price inflation." Ex. 8

6   at 005334 (Exhibit A). No more than 85% of the fund's assets could be invested in fixed income

7   securities, and a maximum of 20% of the portfolio at cost could be invested in balanced and equity

8   mutual funds. *Id.*

9           **B.      Terra Always Followed a Long-Term Buy and Hold Strategy**

10   Terra had always taken a long-term view with respect to its portfolio, including its equity

11   positions. The majority of its assets were municipal bonds – 65% in November 2007. Ex. 14 at

12   TERRA 4948. Terra historically maintained an equity allocation of 15-20%. *See, e.g.,* Ex. 9 at

13   TERRA 4814 (1995 to 2005). Terra held its equities in a variety of mutual funds.

14   Towneley and NYL Investments both recommended that Terra choose an asset allocation

15   between fixed income and equities and then maintain investment discipline over the long-term.

16   Ex. 72 at 86:10-89:13, 250:18-251:13 (Coduto); Ex. 76 at 51:4-52:15 (Withiam); Ex. 86 at 22:1-

17   24:17 (McCain). This allocation always included an equity component. Terra's investment

18   guidelines explicitly recognized that equities performed the critical function of serving as a hedge

19   against inflation. Ex. 8 at TERRA 005334 (Exhibit A). Sabella and McCain determined that a 15%

20   equity allocation was the minimum necessary to achieve this goal. Ex. 5 at NYLIM 07865.[2]

21   Once the allocation was set, Terra would only sell or buy assets annually or semi-annually to

22   "rebalance" back to the percentage targets based on changes in market value. David Coduto,

23   Terra's President and CEO, confirmed to NYL Investments that Terra had a buy and hold strategy

24   with respect to its equities:  "The bottom line is that we have given you money to invest, only to let

25   it ride. We would occasionally re-balance the portfolio and make some sales, and would always

26

27
_____

28   [2] McCain's opinion has never changed. Ex. 86 at 114:3-116:7; although Sabella is deceased, there is no evidence hers did either.

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

4

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1 reinvest dividends." Ex. 4. Coduto and others at Terra also represented to Terra's auditors that
2 Terra maintained a long-term investment strategy. Ex. 6.

3              **C.**     **The Sale of Third-Party Mutual Funds**

4        About one-half of Terra's equity holdings were in proprietary mutual funds managed by
5 NYL Investments; the other half were in third-party funds. Ex. 10 at TERRA 008200. In 2005,
6 Sabella informed Terra that NYL Investments had changed its advisory model and would no longer
7 manage investments in third-party mutual funds. Ex. 7. NYL Investments made a detailed
8 disclosure comparing advisory and mutual fund fees under the existing and proposed new
9 arrangement. Ex. 8. In November 2005, Terra approved the sale of third-party mutual funds and
10 reinvestment in NYL Investment managed mutual funds. *Id.*

11              **D.**     **The November 2007 Board Meeting**

12        By April 2006, Terra had instituted an asset allocation model with 20% of Terra's
13 investments in blended and equity mutual funds. Exs. 10 & 11. Because some of these funds held
14 fixed income assets, the actual equity allocation in Terra's portfolio was 17.2%. Ex. 37. In June
15 2007, Coduto expressed concerns to NYL Investments about the U.S. economy. A week before
16 Terra's November 2007 Board meeting, Coduto sent an agenda to Sabella indicating he would raise
17 these concerns to Terra's Board and raise the issue of whether Terra should reduce or eliminate its
18 equity holdings. Ex. 12. Coduto listed specific concerns about the U.S. economy, including, for
19 example, the U.S. deficit, the cost of the Iraq war, and unfunded Social Security obligations. *Id.*

20        NYL Investments provided a portfolio review for the November 2007 meeting. Ex. 14.
21 Sabella's presentation contained a "Market Review" that addressed a variety of economic factors,
22 including unemployment and payroll, housing prices, the U.S. dollar and earnings reports. *Id.* at
23 TERRA 4936. The Market Review also disclosed the fact that in the summer prominent hedge
24 funds had caused "a tremendous amount of volatility in the market," and that investors were buying
25 more U.S. Treasuries due to a "massive flight to quality." *Id.* Terra's Board meeting minutes
26 indicate that Sabella had a detailed discussion with the Board regarding the economy, the relative
27 performance of different asset classes in Terra's account, and Terra's investment strategy and
28 guidelines:

BARGER & WOLEN LLP
680 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

5

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1
2
3
4

The history of the relationship between NYLIM and Terra was reviewed, as was the historical performance of terra's investment portfolio in relation to other indices. An overview of the current state of the financial markets was presented, as was an assessment of the overall state of the economy, including data related to interest rates, the value of the U.S. dollar in relation to other currencies, unemployment statistics, home sales, and historical charts of the stock and bond markets.

5
6
7
8

Statistics were reviewed that compared yields of municipal bonds to those of corporate bonds, as well as comparing yields of international equities to those of domestic equities. The Company's current investment strategy was reviewed and discussed in detail, as was the recent performance of the Company's investment portfolio. . . . The Company's current investment guidelines were reviewed in detail and it was decided to re-balance the Company's investment portfolio to the investment guidelines before the end of the year.

Ex. 16.

9
10

Sabella told the Board that equities tend to outperform other assets over time and

11

recommended that Terra maintain its equity allocation. Ex. 81 at 127:12-15 (Longo); Ex. 83 at

12

70:7-72:4 (Charles). On macro-economic issues, Sabella stated NYL Investments' strategist's

13

belief that the economy was "fundamentally sound." Ex. 16. She cautioned, however, that she was

14

not an expert in economic forecasting and offered to bring a NYL Investments economist to the

15

next meeting. Ex. 76 at 89:23-90:8 (Withiam). Afterwards, Coduto sent an e-mail to Sabella

16

thanking her for doing a "great job." Ex. 17.

17

A few weeks later, NYL Investments sent all of Terra's directors and Coduto an email with

18

an internet link to the MainStay "Economic and Market Review" for the third quarter of 2007

19

(Terra held MainStay funds, managed by NYL Investments), which discussed among other things:

20
21

- Uncertainties about the future economic outlook, noting that the economy was "far from robust" even though investors appeared to be betting that a "recession had been averted."

22

- The escalating housing and subprime mortgage crisis, the credit crunch, and volatility in the stock and bond markets.

23
24

- Federal Reserve Chairman Ben Bernanke's opinion that "problems that likely will be worse before they get better."

25

- That many investors had shifted investments from bonds to U.S. Treasuries in a "massive flight to quality due to troubles in the subprime mortgage market."

26

Ex. 19. Two directors responded with e-mails stating that the MainStay "Economic and Market

27

Review" was helpful. *Id.;* Ex. 20.

28

6

1         **E.**     **Terra Obtains Asset Allocation Information from Multiple Sources**

2         After the November 2007 Board meeting, Coduto contacted A.M. Best, an insurance rating

3 agency, and Terra's outside auditor, to get opinions about asset allocation for property and casualty

4 insurers like Terra. A.M. Best told Coduto that it believed Terra's equity allocation should be

5 around 12%. Ex. 20. The auditors indicated a 15 to 20% equity position was appropriate. Ex. 23.

6 Coduto asked NYL Investments to research equity allocations in the industry for companies like

7 Terra. NYL Investments' research indicated that the average in the property and casualty industry

8 was 15%. Ex. 32.

9         In early 2008, Coduto had discussions with Wes McCain about asset allocation. Ex. 86 at

10 65:2-76:4 (McCain). McCain had returned to Towneley after he left NYL Investments in 2004. *Id.*

11 at 18:20-19:17. McCain provided Coduto with a study demonstrating the importance of equities as

12 a hedge against inflation. Ex. 24. This information was included in the Board packet for a March

13 2008 meeting, along with a Time/CNN article entitled "How Bad Will the Mortgage Crisis Get?", a

14 "2008 Economic Forecast" by Bill Knapp of NYL Investments, and NYL Investments' Market

15 Outlook for the 4th Quarter 2007. Ex. 26. Knapp was a NYL Investment economist who also

16 worked with the MainStay mutual funds. In his 2008 forecast, Knapp opined that there would be a

17 continued slowdown due to problems with commodity prices, housing and consumer spending, but

18 a recession likely would be avoided. Ex. 26 at TERRA 7944. NYL Investments' Market Outlook

19 noted that markets "were yet again roiled by credit market and subprime concerns" and that

20 "[r]ecession became a heightened concern for market participants." *Id.* at TERRA 7947.

21         **F.**     **The March 2008 Board Meeting**

22         Sabella and Knapp attended Terra's March 2008 Board meeting. According to Terra's

23 meeting minutes, the Board and NYL Investments "reviewed and discussed in detail" Terra's

24 investment performance related to market indices, Terra's investment strategy and investment

25 guidelines, the performance of the bond and equity markets, the overall state of the national and

26 global economies, interest rates, and homeowner and credit financial crises. Ex.30.

27         Terra's directors were impressed with the thoroughness of Knapp's presentation about the

28 economy. Ex. 76 at 161:3-162:6 (Withiam); Ex. 84 at 101:20-102:9 (DeJidas); Ex. 85 at 62:21-

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

7

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  64:12 (Sargeant). Knapp analyzed a host of macro-economic factors – including gross domestic

2  product, bond spreads, credit spreads, home prices, vacancy rates, residential and non-residential

3  investment, exports, retail and food services sales, manufacturer's orders for durable goods,

4  unemployment claims, payrolls, labor costs, the consumer price index, gasoline prices, price of oil,

5  speculation in commodity derivatives, the performance of the S&P 500, price/earnings ratios, and

6  inflation. Ex. 26. Knapp gave his opinion that the economy was in a mid-cycle slowdown but a

7  recession would likely be averted. He summarized his presentation as follows:

8      The overall message was that the economy was weakening, had exhibited signs of
       weakness, that the housing market was in trouble and had detrimentally affected
9      growth rates, that, in part, that it had been compensated by increasing levels in
       growth in export, that the largest part of the economy, the consumer, was still a
10     question mark. Spending was at a downturn, would it continue at a downturn. Not
       only was housing impacting the consumer ability to spend, but … the elevated price
11     of gasoline, it impinged the ability of consumers to spend. In all likelihood, that
       irrationality exhibited in the energy market would dissipate, and, hopefully, the
12     housing market would show signs of recovery. Energy prices would come down, and
       consumer spending would remain elevated enough to avoid an actual recession, but
13     just result in a mid-cycle slowdown.

14  Ex. 75 at 113:2-114:2.

15          **G.      The Severe Stock Market Downturn in Late 2008**

16          The stock market suffered a substantial downturn in late 2008. From September 1 to

17  December 31, 2008, major stock market indices declined from 24-30%. Request for Judicial Notice

18  ("RJN") ¶¶ 7-14. Terra's portfolio was insulated from much of this decline because most of its

19  funds were in municipal bonds that were unaffected by the subprime crisis.

20          On September 29, 2008, Coduto spoke with Sabella by phone and accused NYL Investments

21  of negligence. Ex. 46; Ex. 72 at 321:2-7. Coduto had a conference call the following day with

22  Sabella and her supervisor, Tony Elavia. Coduto contended that NYL Investments was responsible

23  for Terra's losses in the stock market and indicated that he intended to inform the Board of this fact.

24  Ex. 47; Ex. 72 at 319:12-20. That same day, Coduto had a telephone call with McCain in which he

25  told McCain that NYL Investments would be fired at the upcoming Board meeting and Terra was

26  considering suing NYL Investments. Ex. 48; Ex. 72 at 324:10-330:15. Coduto also discussed

27  investment strategies with McCain. Ex. 72 at 324:10-330:15.

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

8

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   At Terra's November 4, 2008 Board meeting, the Board of Directors terminated the

2   Agreement with NYL Investments and retained Towneley. Ex. 57. The Board also gave authority

3   to liquidate all equity holdings. *Id.*. The liquidation took place on November 13, 2008.[3] Prior to

4   learning of Terra's decision to retain a new adviser, NYL Investments sent Terra a letter indicating

5   that it was terminating the agreement because of changes in Sabella's health. Ex. 54; Ex. 78 at

6   234:2-21 (Elavia). In mid–October, Sabella suffered a debilitating illness from which she never

7   recovered; she died in mid-2009. Ex. 78 at 232:24-223:20.

8   ## H.   Terra Sues Based on False Allegations about the Quality Tilt Program

9   Terra's complaint alleges seven claims: three fraud-based claims for relief – intentional

10   misrepresentation, intentional concealment, and negligent misrepresentation – and separate claims

11   for breach of fiduciary duty, breach of contract, breach of the implied covenant, and professional

12   negligence. The fraud and breach of fiduciary duty claims all rest on allegations that Sabella and

13   Knapp were not merely wrong about the economic forecast, but gave intentionally false opinions.

14   Terra bases its fraud-based allegations solely upon the Quality Tilt. Terra alleges that the

15   Quality Tilt reflected *NYL Investments'* internal decision to eliminate or substantially reduce *its* own

16   holdings due to a belief the economy was "unstable," at the same time that Sabella was

17   recommending that Terra maintain its equity position. Complaint ¶ 43. Terra again stated these

18   contentions in written discovery. Exs. 62 & 63. Terra seeks damages premised on complete

19   liquidation of equities at the time of the November 2007 board meeting. Ex. 61.

20   ### (1)   New York Life's Quality Tilt Program did Not Involve
###         NYL Investments' Assets

21

22   Terra's assertions about the Quality Tilt are indisputably false. Terra bases its entire claim

23   on statements made in a "Special Report" by Gary Wendlandt, the Chief Investment Officer and

Vice Chairman of New York Life. This Report was contained in the "New York Life Annual

24   Report 2007," which New York Life published. Ex. 59. Wendlandt and others at New York Life

25   drafted the Special Report without any involvement by NYL Investments. Ex 77. at 168:7-174:11

26   (McArdle).

27

28   ___

[3] Terra's new investment guidelines with Towneley set a 15% equity allocation. Ex. 58 at 00557.

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

9

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1    In his report, Wendlandt stated that New York Life had decided over a year earlier, in

2    February 2007, to divert some its cash flow from its normal credit market investments to

3    U.S. Treasuries. This adjustment to New York Life's fixed income portfolio became known as the

4    Quality Tilt. This program did not involve any NYL Investments assets. Ex. 59 at NYLIM452632.

5    **(2)    The Quality Tilt did Not Concern Equities**

6    The Quality Tilt had nothing to do with equities. BBB-rated corporate bonds are the largest

7    asset class in New York Life's portfolio. Wendlandt believed in late 2006 that the "spreads" on

8    BBB bonds were too narrow (*i.e.*, the difference between the interest paid on BBB bonds compared

9    to higher-grade investments). Ex. 70. In his opinion, investors in credit markets were loaning

10   money too freely, and the interest being paid on debt instruments was not commensurate with the

11   risk. *Id.* Wendlandt's sole focus was on the credit markets. His recommendation for the program

12   made no projections and stated no opinions about the stock market, the economy, or the potential

13   impact of credit market developments on either. Ex. 70; Ex. 90 at 327:3-11. Under the Quality Tilt,

14   New York Life allocated 10% of its new investible cash flow from what would have been invested

15   in BBB bonds into U.S. Treasuries. Ex. 70. New York Life still continued to buy BBB bonds and

16   did not sell any assets under the program.[4] The result by the end of 2007 was a 2% increase in the

17   percentage of U.S. Treasuries in New York Life's fixed income portfolio. Ex. 59 at NYLIM4539.

18   **(3)    NYL Investments did Not Conceive of or Recommend the Quality Tilt**

19   New York Life has a $140 billion portfolio and its own staff of financial and investment

20   personnel. Ex. 77 at 179:23-180:11 (McArdle); Ex. 90 at 131:23-134:4 (Wendlandt). Wendlandt

21   conceived of the Quality Tilt. He and others within New York Life developed it. Ex. 77 at 65:24-

22   66:5; Ex. 90 at 275:15-276:6, 321:4-12. New York Life advised NYL Investments personnel

23   involved in managing its portfolio of the developing program only after New York Life had begun

24   financial modeling for and preliminarily approved it. Ex. 77 at 92:19-93:18; Ex. 79 at 111:3-

25   114:13, 117:3-121:8 (Seter). NYL Investments' role was to assist New York Life as requested and

26   to implement the strategy in accordance with New York Life's directives. Ex. 77 at 142:3-143:4.

27

28   ---

[4] New York Life actually increased its equity holdings in 2007. Ex. 59 at NYLIM4538.

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

10

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1    There was no unanimity of opinion within NYL Investments or New York Life about the

2    benefits of implementing the Quality Tilt.  In 2006 through 2008, Frank Ollari was the senior

3    officer at NYL Investments responsible for managing New York Life's fixed income assets.  Ex. 91

4    at 14:9-16:12.  Ollari disagreed with the decision to redirect the cash flow to U.S. Treasuries.  *Id.* at

5    112:23-113:16.  Even within New York Life, there was an understanding that the program could be

6    unprofitable, and some within New York Life did not agree with it.  *Id.* at 111:17-24.

7    New York Life's analyses prior to the implementation of the program even modeled how the

8    portfolio would be affected under a variety of scenarios, some of which assumed the rationale

9    behind the Quality Tilt might prove incorrect.  Ex. 70 at NYLIM28880-81.

10   **(4)   Terra's Investment Advisors Did Not Work on New York Life's Account or Receive Information Regarding the Quality Tilt**

11

12   Terra's fraud and breach of fiduciary duty claims depend upon statements and alleged

13   omissions by Sabella and Knapp.  Neither Sabella nor Knapp worked on New York Life's account

     or received information about the Quality Tilt.  Ex. 75 at 175:9-176:5 (Knapp); Ex. 78 at 51:23-
14
     53:4, 64:19-65:14, 68:3-69:2 (Elavia) . Knapp testified that he did not learn about the Quality Tilt
15
     until after the filing of this lawsuit and that nothing about it would have changed the opinions he
16
     presented to Terra.  Ex. 75 at 175:9-176:3.  There is no evidence that Joan Sabella, now deceased,
17
     ever knew about the program.  Even if one of them had heard of the Quality Tilt, there is no
18
     evidence that either had any substantive discussions or communications with anyone about it.  *Id.*
19
     Terra's theory of liability, therefore, is based on the failure to disclose an investment strategy about
20
     which neither Sabella nor Knapp had any personal knowledge.
21
                                    **4.   DISCUSSION**
22
              **A.   New York Life and NYL Investments are Separate Entities and Must be
23                   Treated as Such**

24   New York Life and NYL Investments are two distinct companies.  The former is a life

25   company; the latter, an investment adviser.  NYL Investments is a wholly-owned subsidiary of New

26   York Life Investment Management Holdings LLC, which in turn is a subsidiary of New York Life.

27   Ex. 60 at TERRA 005348.  Terra did not sue New York Life or make any allegation of alter ego or

28   agency.

11

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1        Terra instead contends that the actions of New York Life can be imputed to

2   NYL Investments because Wendlandt is the Chief Investment Officer of New York Life and the

3   Chairman of the Board of Managers of NYL Investments. The fact that companies share officers

4   does not make them alter egos. *See, e.g. Calvert v. Huckins,* 875 F. Supp. 674, 678 (E.D. Cal. 1995)

5   (interlocking officers not sufficient to confer alter ego status). Nor does it mean that the activities

6   Wendlandt does in his capacity as Chief Investment Officer for New York Life are on behalf of

7   NYL Investments. The Supreme Court has affirmed the "well established principle [of corporate

8   law] that directors and officers holding positions with a parent and its subsidiary can and do 'change

9   hats' to represent the two corporations separately, despite their common ownership." *United States*

10  *v. Bestfoods*, 524 U.S. 51, 69 (1998). The Court also recognized the presumption that "directors are

11  wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.; see*

12  *also Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 779 (5th Cir. 1997) (failure to adduce evidence

13  showing which entity dual officer represented required summary judgment).

14       Wendlandt never had any responsibility for Terra's or any other client's account in his

15  capacity as Chairman of NYL Investments. As Chairman, Wendlandt does not provide investment

16  advice or have responsibility for the day-to-day operations of that company. Ex. 90 at 316:2-8. His

17  work on the Quality Tilt solely related with his duties as New York Life's Chief Investment Officer;

18  as a matter of law they cannot legally be attributed to NYL Investments.

19       **B.    NYL Investments has no Duty to Disclose the Investment Opinions or Strategies
             of One Client to Another**

20

21       NYL Investments provides asset management services to New York Life pursuant to an

22  investment advisory agreement. Ex. 71. New York Life is entitled to the same expectations of

23  confidentiality as in any investment advisory relationship. The asset management contract between

24  New York Life and NYL Investments prohibits the disclosure of "all information and advice

25  furnished by either party" in the course of the relationship. Ex. 71 at NYLIM28829.[5]

26  New York Life expected NYL Investments to maintain the confidentiality of information about the

27  Quality Tilt. Ex. 90 at 206:23-207:8 (Wendlandt); Ex. 91 at 73:17-74:14 (Ollari).

28  [5] The Agreement did not confer rights or benefits upon any third party. Ex. 71 at NYLIM28830.

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

12

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1         Terra's theory of liability presumes that NYL Investments had a duty to disclose the

2 investment strategies of one client, New York Life, to another, Terra. Any such duty would conflict

3 with obligations under securities laws and the common law to maintain client confidences. The

4 relationship between investment advisors and their clients is fiduciary in nature. *SEC v. Capital*

5 *Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963). As with any fiduciary relationship, the

6 agent has the obligation to maintain the confidences of its principal. *Blickman Turkus, LP v. MF*

7 *Downtown Sunnyvale, LLC,* 162 Cal. App. 4th 858, 888 and n.8 (2008) (citing Restatement (Third)

8 of Agency § 8.05) (agent may not disclose confidential information); *General Acquisition, Inc. v.*

9 *GenCorp Inc.*, 766 F. Supp. 1460, 1475 (S.D. Ohio 1991); *see also* RJN, Ex. E, CFA Institute for

10 Financial Market Integrity, Asset Manager Code of Professional Conduct, 2005 at 4 (advisor

11 responsible for maintaining confidentiality of information communicated by clients).

12         As a matter of law, NYL Investments had no duty to give Terra information that NYL

13 Investments had no right to disclose. Its affiliation with New York Life does not diminish this rule.

14 To hold otherwise would completely disregard of the basic tenets of corporate law. *See Bestfoods*,

15 524 U.S. at 70 (upholding "time-honored common law rule" of corporate distinctiveness).

16 NYL Investments had no right, without New York Life's consent, to disclose any aspect of New

17 York Life's Quality Tilt prior to New York Life's release of Wendlandt's Special Report in early

18 2008 – after the November 2007 Terra Board meeting at which it claims it would have liquidated its

19 equities. Even thereafter, NYL Investments could only share information about the Quality Tilt to

20 the extent it had been made public by New York Life. Even the fact that certain information was

21 then in the public realm, however, does not mean that NYL Investments had a legal duty to provide

22 it or that it was material to Terra's account.

23     **C.**    **NYL Investments Representatives had No Legal Duty to Seek and Obtain**
          **Information About New York Life's Investment Strategies when Responding to**

24           **Terra's Inquiry**

25         **(1)**    **NYL Investments Never Agreed to Provide Such Information and Terra**
                 **Never Expressed any Interest in New York Life's Investment Strategies**

26

27 NYL Investments never promised to provide information about New York Life's

28 investments or its views on the economy. The Agreement does not require this. Ex. 1. The course

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

13

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1 of dealing also establishes that neither party thought this information was material. Terra never
2 requested information about New York Life's investment strategies, and there is no evidence that
3 NYL Investments had ever obtained such information for Terra. Ex. 76 at 114:2-115:20 (Withiam);
4 Ex. 80 at 106:8-16 (Dunne); Ex. 81 at 147:13-148:7 (Longo); Ex. 82 at 80:4-21 (Parello); Ex. 83 at
5 76:11-77:3 (Charles); Ex. 84 at 85:10-86:7 (DeJidas); Ex. 85 at 82:25-83:12 (Sargeant). Even
6 though New York Life's annual reports are publicly available, nobody from Terra ever reviewed
7 one before preparing this lawsuit.

8
9
        **(2)**   **Requiring Advisors to Account for the Investment Strategies of Affiliated Companies would Conflict with the Advisor's Duty to Provide Independent Advice Based on Each Client's Circumstances**

10      Terra's theory presumes one of two things: NYL Investment's portfolio managers, such as
11 Sabella, were required to inquire into New York Life's opinions and strategies whenever a client
12 posed a question about the economy, market conditions or investment strategies, or NYL
13 Investments was required to employ an organizational structure that automatically distributed this
14 information to the individual portfolio managers so they could disclose them to other clients. The
15 apparent rationale is that NYL Investments was obligated to ensure that all information and any
16 recommendation a portfolio manager gave a non-affiliated client was consistent with New York
17 Life's opinions and approach.

18      The SEC, which regulates investment advisors, recognizes that an adviser is a fiduciary and
19 as such must have a "reasonable independent basis" for any recommendation. *In the Matter of*
20 *Alfred C. Rizzo*, Advisors Act Release No. 897 (Jan. 11, 1984). There is no legal authority holding
21 that a reasonable investigation must include obtaining the opinions and investment strategies of
22 affiliated companies. Such a rule would also conflict with an adviser's obligation to provide advice
23 based upon consideration of the specific client's circumstances. Terra's contentions presume that it
24 was similarly situated with New York Life such that the latter's investment opinions and strategies
25 would be material to Terra. *See* RJN, Ex. F, CFA Institute, Standards of Practice Handbook, p. 69,
26 9th Ed. 2005 (investment advisors must consider the needs, circumstances and objectives of a client
27 when determining suitability of course of investment action, and judge "suitability of investments in
28 the context of the client's total portfolio").

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

14

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1        Terra and New York Life are nothing alike and there is no evidence of similar objectives,

2   risk tolerance, return requirements, or investment constraints. *See id.* New York Life is a life

3   insurer with a $140 billion portfolio consisting primarily of fixed income investments (mostly

4   corporate bonds), a 6-7% equity allocation, and no municipal bonds. Ex. 59 at NYLIM4538-42. It

5   has a multifaceted portfolio containing, among other investments, corporate bonds, public and

6   private equity, real estate investment trusts, convertible stocks, residential mortgage loans,

7   derivatives, cross-currency swaps, asset backed securities, and commercial mortgage backed

8   securities. *Id.* Terra is a liability insurer that had a $25 million portfolio consisting predominantly

9   of municipal bonds and a 15-20% equity allocation held in mutual funds. No reasonable investment

10   adviser would consider that what New York Life decided was suitable for it, for whatever business

11   reasons it may have, would also be appropriate for Terra.

12        **D.        There was no Failure to Disclose Material Facts**

13        Questions of materiality can be determined as a matter of law. *McCormick v. Fund Am.*

14   *Colonies, Inc.,* 26 F.3d 869, 884 (9th Cir. 1994). Under federal securities laws, a misrepresentation

15   or omission is material if there is a substantial likelihood that a reasonable investor would have

16   acted differently if the misrepresentation had not been made or the truth had been disclosed. *Livid*

17   *Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F. 3d 940, 947 (9th Cir. 2005). The same

18   standard applies to state law claims for fraud. *See Ins. Underwriters Clearing House v. Natomas*

19   *Co.,* 184 Cal. App. 3d 1520, 1526 (1986) (citation omitted); *see also, e.g., Lynch v. Cook,* 148 Cal.

20   App. 3d 1072, 1081-82 (1983) (objective standard applies). Hence, materiality cannot be

21   established by Terra's claim, in hindsight, that had it known about the Quality Tilt it would have

22   liquidated all equities.

23        Terra's directors all testified that knowledge about the Quality Tilt program would have

24   tipped the scales and caused them to reject NYL Investments' recommendation to maintain their

25   equity investments. Terra's directors uniformly cited the Special Report in the New York Life 2007

26   Annual Report, asserting that it shows that New York Life had concerns about credit markets, had

27   the same concerns about "the economy" as Coduto, and was shifting investments to U.S. Treasuries.

28   *See, e.g.,* Ex. 83 at 158:1-16 (Charles); Ex. 84 at 170:19-172:19 (DeJidas).

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

15

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1    There is no evidence that New York Life was concerned about anything raised by Coduto.
2    Coduto's agenda for the November 2007 Terra meeting set out specific factors, for example, the
3    U.S. national debt, the price of the Iraq war, unfunded Social Security costs, the value of the dollar
4    against other currencies and commodities prices. Coduto expressly posed the question of whether
5    these factors "would have material impact on the U.S. economy and hence the stock market?"
6    Ex. 12. Wendlandt, the architect of the Quality Tilt, did not consider any of these factors in
7    developing the program. Ex. 70; Ex. 90 at 322:16-327:20, 327:3-11.

8    Wendlandt's memorandum recommending the Quality Tilt focused on credit market issues
9    and, in particular narrow bond spreads for BBB corporate bonds that were purchased for New York
10   Life's portfolio. Ex. 70. Wendlandt did not consider or forecast how credit issues might impact the
11   stock market, nor did he consider or have any opinion as to the overall economy. *Id.* Indeed, his
12   Special Report does not even use the word "economy." Ex. 59 at NYLIM4526-32.

13   Despite Terra's directors' claim that the Quality Tilt was highly material, they testified that
14   the actual details of the program would not have been relevant to their decision. Ex. 80 at 222:21-
15   224:2 (Dunne); Ex. 81 at 239:14-243:18 (Longo). They claimed, for example, that it would not
16   have been material to their investment decision to know that the Quality Tilt did not involve
17   equities and that Wendlandt's observations about the credit markets did not result in the sale of any
18   assets. No reasonable investor could possibly infer from the actual facts that New York Life had
19   the "same" or "similar" concerns as Coduto, thought the economy was "unstable," or that any
20   observation or prediction was being made with regard to the future of the stock market. Terra
21   cannot cherry pick a few quotes out of the New York Life Special Report and wall off the complete
22   facts about the Quality Tilt. The materiality of information in the investment context is an objective
23   test that must be considered in light of "all the circumstances." *Ins. Underwriters,* 184 Cal. App. 3d
24   at 1526. A reasonable investor would make an informed decision based on the actual facts.

25   Moreover, by November 2007, when Terra asked for Sabella's recommendation about its
26   equity allocation, the credit crisis and the subprime crisis were publicly known. In Fall 2007 and
27   continuing through March 2008, NYL Investments communicated with Terra regarding many
28   adverse economic issues, including:  the subprime crisis; the credit crisis and liquidity concerns;

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

16

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  trends in bond spreads; declining housing prices; volatility in the stock and bond markets; interest
2  rate reductions by the Federal Reserve in response to the weakening U.S. economy; and differing
3  views on future economic and stock market conditions, including whether a recession was occurring
4  or would occur. Exs. 14, 19, 26, 27, 28, 32. Terra has seized upon Wendlandt's use of the term
5  "irrationality" to describe "the markets," as highly significant (he was only referring to the credit
6  markets as the balance of the Report makes clear). NYL Investments told Terra that the markets
7  were "volatile," had been "roiled," and described the "gyrations" of the stock market as
8  "undoubtedly [leading] to many sleepless nights." Ex. 19 at NYLIM1310. It is absurd for Terra's
9  directors to suggest that if they'd been told one word, "irrationally," they would have voted
10  differently.

11  Terra's directors claim that they should have been told New York Life was moving some
12  investments into US Treasuries, yet NYL Investments told Terra that investors were "flocking" to
13  US Treasuries and that there had been a "flight to quality" in light of market concerns. Ex. 19 at
14  NYLIM1315. Terra's directors knew that there was a movement in the market away from riskier
15  bonds to higher grade assets, but this information did not cause Terra's directors to liquidate its
16  equities. *Id.* Terra's directors cannot now reasonably contend that if they had known one additional
17  fact – namely that a particular investor, New York Life, was purchasing some US Treasuries – they
18  would have voted against the recommendations of Terra's investment advisor and in contravention
19  of its 20-year history of long-term investment strategy.

20  Since its inception in 1989, Terra had taken a long-term view of its equity portfolio, even
21  during periods of economic uncertainty. In January 2008, Terra confirmed this long-term approach
22  in a communication with its outside auditor. Ex. 22. Terra's memorandum recognized that there
23  were "predictions for continued difficulties in the financial sector" but assured the auditor that Terra
24  "traditionally has taken a long view of their investments" and that Terra had the "intent, and proven
25  ability," *to hold equity securities through downturns in market conditions. Id.* at NYLIM13325
26  Terra had information from NYL Investments, its auditors and A.M. Best confirming that similar
27  types of insurers maintained investments in equities. Ex. 18. Terra cannot possibly show that,

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

17

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  under all the circumstances, that a reasonable investor in its situation would have liquidated its

2  equities if provided New York Life's opinions and Quality Tilt.

3        **E.**    **NYL Investments' Statements about the Economy were not Actionable**

4             **(1)**    **There is No Evidence of Knowingly False Statements**

5        Sabella and Knapp are the only individuals who made any affirmative statements that Terra

6  claims were false. Ex. 76 at 66:19-67:1 (Withiam); Ex. 82 at 73:5-10, 81:5-9 (Parello); Ex. 84 at

7  62:4-10 (DeJidas). Terra contends that they gave false opinions about the economy. The only facts

8  Terra offers to support this claim relate to alleged attempts to suppress the Quality Tilt. There is no

9  evidence that Sabella or Knapp knew about the Quality Tilt or any other aspect of New York Life's

10  portfolio. Ex. 75 at 175:9-176:5 (Knapp); Ex. 78 at 51:23-53:4, 64:19-65:14, 68:3-69:2 (Elavia).

11  Even if one of them had heard about it, there is no evidence that they had any substantive

12  communications with anyone about the program. The program's mere existence cannot support the

13  inference that Knapp and Sabella misrepresented their true opinions about the economy. Moreover,

14  an opinion that the economy is "fundamentally sound" was not inconsistent with the Quality Tilt.

15  The program did not portend a collapse of the stock market or the overall economy.

16             **(2)**    **Sabella and Knapp had Reasonable Grounds for Their Opinions**

17        Sabella and Knapp had reasonable grounds for their opinions about the economy. At Terra's

18  November 2007 meeting Sabella had a detailed discussion with Board members that addressed the

19  markets, the historical performance of Terra's portfolio, unemployment statistics, the sub-prime

20  crisis, historical charts regarding stock and bond markets, and Terra's investment strategy. Ex. 14;

21  Ex. 16. Sabella presented NYL Investments' strategist's opinion that the economy was

22  "fundamentally sound" but acknowledged that she was not an expert in economic forecasting and

23  offered to bring an economist to the next meeting. Ex. 16.

24        At the next meeting, Knapp analyzed a host of macro-economic factors, including inflation,

25  the GDP, exports and commodities and had an extensive discussion with Terra's Board. Knapp's

26  opinions would not have been affected if he had known of the Quality Tilt. And, his analysis

27  addressed many of the same issues underlying the Quality Tilt program, such as credit problems,

28  bond spreads and problems in housing markets. Ex. 28. Knapp gave his opinion that the economy

BARGER & WOLEN LLP
680 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

18

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  was in a mid-cycle slowdown and that the economy would continue to decline but narrowly avert a
2  recession. Knapp's opinions about the economy were in line with what other economists believed
3  at the time. RJN ¶¶ 1-4; Ex. 65.

### (3) Terra Could Not Justifiably Rely Upon Opinions about the Economy

5  Terra could not justifiably rely upon any statements that Sabella or Knapp made about future
6  economic performance. Opinions about the economy or forecasts about future economic
7  performance cannot support a claim for intentional or negligent misrepresentation. *See Neu-Visions*
8  *Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 103 (2000). Statements of opinion
9  sometimes can be actionable if a person gives a knowingly false opinion. But there is no evidence
10  of that here. Terra's directors testified that they were aware of problems in the financial sector,
11  knew that Knapp's projections about the economy were opinions, and understood that he could be
12  wrong. *See, e.g.,* Ex. 76 at 163:4-8 (Witham); Ex. 85 at 73:1-23 (Sargeant). Terra could not have
13  justifiably relied on NYL Investments' opinions or justifiably believed that NYL Investments'
14  statements were a representation of fact.

### F. NYL Investments is Entitled to Judgment as a Matter of Law against Terra on Each Claim for Relief

### (1) The Fraudulent Misrepresentation Claim

Terra must establish the following: "(1) a false representation as to a material fact, (2)
knowledge of the falsity, (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage."
*See Fraker v. Sentry Life Ins. Co.*, 19 Cal. App. 4th 276, 285 (1993). Terra cannot establish that
Knapp and Sabella made any false opinions and that there was any intent to defraud. These
allegations rest entirely upon inferences from the Quality Tilt, but there is no evidence that either
individual knew about the program, agreed with it, or had any substantive discussions about it with
anyone. NYL Investments' opinions about the economy also are not actionable.

### (2) The Intentional Concealment Claim

Terra must establish: (1) the concealment or suppression of a material fact; (2) a duty to
disclose the fact; (3) an intent to conceal with the intent to defraud; (4) that it was unaware of the

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

19

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1 | fact and would not have acted as it did if it had known of the concealed or suppressed fact; and (5)

2 | damages. *See Lovejoy v. AT & T Corp.,* 119 Cal. App. 4th 151, 157 (2004).

3 |       Terra cannot establish that Sabella or Knapp "concealed or suppressed" the Quality Tilt –

4 | they cannot suppress information that they did not possess. Terra cannot show that

5 | NYL Investments had any duty to disclose any information it obtained in the course of managing

6 | New York Life's portfolio, including the Quality Tilt. There is no obligation under the law for an

7 | adviser to disclose the confidential investment strategies of one client to another. The fact that one

8 | client is an affiliated company does not erode the right of confidentiality. Even if NYL Investments

9 | could disclose some aspects of New York Life's strategies, Sabella had no legal duty to investigate

10 | New York Life's portfolio in response to Terra's inquiry about equities.

11 |       Terra cannot establish materiality or causation. Terra was aware of many positive and

12 | negative facts about the economy, including "predictions for continued difficulties in the financial

13 | sector," and knew that many investors already were moving their funds from credit investments to

14 | U.S. Treasuries. Ex. 22. Under the circumstances, there is no basis to infer that a reasonable, long-

15 | term institutional investor would have liquidated its equities *if only* it had learned about the "tilt" in

16 | New York Life's fixed income portfolio.

17 |            **(3)   The Negligent Misrepresentation Claim**

18 |       Terra must establish: (1) that NYL Investments made a representation as to a past or

19 | existing material fact; (2) that the representation was untrue and NYL Investments had no

20 | reasonable ground for believing it to be true; (3) and that Terra was unaware of the falsity of the

21 | representation and had been justified in relying upon it. *See Friedman v. Merck & Co.,* 107 Cal.

22 | App. 4th 454, 475-76 (2003). Sabella's and Knapp's opinions about the economy are not "facts"

23 | upon which a reasonable institutional investor would justifiably rely. Nor can Terra establish that

24 | NYL Investment's opinions about the economy lacked a reasonable basis. RJN ¶¶ 1-4; Ex. 65.

25 |            **(4)   The Breach of Fiduciary Duty Claim**

26 |       Terra bases its breach of fiduciary duty claim on allegations that NYL Investments falsely

27 | represented its true opinions about the economy. The only evidence Terra provides to support this

28 | theory relates to the Quality Tilt. Terra cannot establish that NYL Investments had any opinion

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

20

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  different than provided, that NYL Investments had a duty to disclose the Quality Tilt, that the
2  portfolio managers working on the account knew about the program and agreed with the strategy,
3  that there was any plan to conceal the Quality Tilt, that the program was material to Terra's equity
4  investment decision, or that knowledge about the program would have caused a reasonable investor
5  to act differently.

6      The only alternative basis Terra provides for the breach of fiduciary duty claim relates to
7  allegations that NYL Investments "abandoned" the relationship in October 2008. Terra's theory
8  incorrectly assumes that NYL Investments would have recommended that Terra liquidate its equity
9  holdings if it had not "abandoned" the relationship. There is no evidence NYL Investments ever
10  would have made such a radical recommendation or that it "abandoned" Terra. Plaintiff made no
11  inquiries to NYL Investments after its July 2008 Board meeting with respect to its investment
12  allocations until September 29, 2008, immediately after the largest one-day decline in the history of
13  the stock market. RJN ¶ 7. Coduto spoke with Sabella by phone and accused NYL Investments of
14  negligence. He asked what Terra should do with its equities, and Sabella responded that selling
15  would result in losses. Ex. 73 at 214:14-216:4 (Arditti). Coduto had a phone call the following day
16  with Sabella and her supervisor Elavia. Elavia told Coduto that NYL Investments would continue
17  to follow Terra's investment guidelines, unless instructed otherwise. Ex. 72 at 324:10-330:15.

18      Even Terra's new adviser, Towneley, agreed with NYL Investments' recommendation.
19  McCain testified that he never would have recommended that Towneley liquidate its equities.
20  Terra's Board made that decision unilaterally. Ex. 86 at 24:12-16, 60:2-14, 102:2-106:15. McCain
21  believed that a 15% equity allocation was the *minimum* necessary for equities to serve as an
22  effective inflation hedge. *Id.* at 114:3-116:7. The volatility at the end of 2008 did not change that
23  belief. After the November 2008, Board meeting McCain recommended, and Terra's Board
24  adopted, a 15% equity target. Ex. 58 at 0057.

25      Plaintiff's abandonment claim is contrived. Terra also cannot establish causation. Terra
26  cannot show that any alleged "abandonment" caused harm since there is no basis to infer that NYL
27  Investments ever would have recommended liquidation. Nor can Terra establish that it could have

28

BARGER & WOLEN LLP
680 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

21

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1 obtained different advice from another adviser, since the new adviser to whom Terra moved its

2 account would have provided the same advice as NYL Investments.

3          **(5)**      **The Breach of Contract and Implied Covenant Claims**

4       A claim for breach of contract requires a showing of breach. *Parrish v. National Football*

5 *League Players Ass'n*, 534 F. Supp. 2d 1081, 1098 (N.D. Cal. 2007). NYL Investments served

6 interrogatory responses asking Terra to identify all transactions, trades, sales or other conduct that

7 either were unauthorized or fell outside Terra's investment guidelines. In its responses, Terra could

8 not identify a single transaction that violated any term of the investment advisory agreement.

9 Instead, Terra regurgitated its same contentions regarding the duty to disclose Quality Tilt. Ex. 63.

10 Terra's breach of contract and implied covenant claims rest entirely on allegations about the Quality

11 Tilt and the alleged "abandonment." For the reasons discussed above, neither theory is actionable.

12          **(6)**      **The Negligence Claim**

13       A claim for negligence requires a showing that NYL Investments breached a duty of care to

14 Terra and that this breach caused Terra harm. *See Ladd v. County of San Mateo*, 12 Cal. 4th 913,

15 917 (1996). Terra's negligence claim relies upon the same Quality Tilt and abandonment claims as

16 its breach of fiduciary duty and contract claims, and cannot be maintained for the same reasons.

17      **G.**     **Defendants are Entitled to Judgment as a Matter of Law on the Punitive Damages Claim**

18

19       Terra cannot establish that it is entitled to punitive damages. To recover such relief, Terra

20 must demonstrate "by clear and convincing evidence" that NYL Investments acted with

21 "oppression, fraud or malice." Cal. Civ. Code § 3294(a). The evidence must be so clear "as to

22 leave no substantial doubt; sufficiently strong to command *an unhesitating assent* of every

23 reasonable mind." *In re Angelica P.*, 28 Cal. 3d 908, 919 (1981) (emphasis added). This heavy

24 burden also applies in summary judgment motions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

25 242, 254 (1986). "There is no genuine issue if the evidence presented in the opposing affidavits is

26 of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and

27 convincing evidence." *Id.*

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

22
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

Plaintiff's punitive damages claim rest upon allegations regarding the alleged suppression of the Quality Tilt. Terra was given extensive information about the markets, the economy, its portfolio and reasonable opinions about the future of the economy and stock market. There is no evidence, let alone clear and convincing evidence, that Sabella or Knapp ever knew about the Quality Tilt, or that NYL Investments suppressed any material information. NYL Investments had no duty to disclose anything about New York Life's investment strategies and was in fact legally and contractually prohibited from doing so. Terra will have an insurmountable hurdle simply establishing that there was a duty to disclose the Quality Tilt and cannot possibly prove by clear and convincing evidence that the failure to disclose the program amounted to fraud.

Dated: April 1, 2010                                    BARGER & WOLEN LLP


By:     _____//s// Travis R. Wall_____
                 J. RUSSELL STEDMAN
                 TRAVIS R. WALL
                 Attorneys for Defendant
                 New York Life Investment
                 Management LLC

BARGER & WOLEN LLP
660 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

23
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT