**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TERRA INSURANCE COMPANY,

    Plaintiff,

  v.

NEW YORK LIFE INVESTMENT MANAGEMENT LLC,

    Defendant.

No. C 09-01609 WHA

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this civil action involving the alleged failure by an investment advisor to disclose material investment-related information to a client, defendant New York Life Investment Management LLC ("NYLIM") moves for summary judgment against plaintiff and former client Terra Insurance Company. For the reasons explained below, NYLIM's summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

Terra is a "risk retention group" under federal law. In other words, it is a liability insurance company owned exclusively by its policyholders (Okcu Decl. Exh. 8, Exh. 11 at 37). These policyholders pay premiums to Terra, which are then invested and used to pay insurance claims (*ibid.*) Terra's board of directors — which consists almost entirely of engineers — employs the assistance of professional financial advisors to help manage the company's investment portfolio (*id.* at Exh. 11 at 51–55, 311).

In this connection, Terra hired Towneley Capital Management as its investment advisor in 1989 (Wall Decl. Exh.1). Throughout this relationship, Terra worked primarily with Wesley McCain, the Chairman of Towneley, and Joan Sabella, who performed the role of Terra's account representative (*ibid.*; Okcu Decl. Exh. 11 at 69). Mr. McCain was responsible for devising investment strategies, while Ms. Sabella managed the account, answered questions, communicated information, and provided reports (Okcu Decl. Exh. 11 at 71).

In 2000, Towneley's mutual fund and investment advisory services were acquired by NYLIM, the defendant in this action (Wall Decl. Exh. 2). NYLIM is a registered investment advisor that provides asset management and advisory services to various clients, including its parent company, New York Life Insurance Company ("New York Life"). NYLIM is a wholly owned subsidiary of New York Life, who is *not* a defendant in this action (*id.* at Exh. 60).

Following this acquisition, Terra consented in writing to assign its investment advisory agreement — in other words, the continued management of its investment portfolio — to NYLIM (*ibid.*). Thereafter, Terra continued to work with the team of Mr. McCain and Ms. Sabella, who began working for NYLIM following the acquisition (*ibid.*). Sometime in 2004, Mr. McCain left NYLIM and ceased providing strategic advice for Terra's investment portfolio (Br. 3; Opp. 3). His role was replaced by NYLIM strategist Tony Elavia (Okcu Decl. Exh. 11 at 70–71). Ms. Sabella, however, remained Terra's account representative at NYLIM until falling ill in late 2008. She passed away in mid-2009 (*ibid.*; Wall Decl. Exh. 78 at 222-23).

Terra's allegations in this litigation center on three events that occurred between 2005 and 2008. Painting with a broad brush, Terra accuses NYLIM of failing to disclose (or outright fraudulently misrepresenting) material information about the declining health of credit markets and the economy to its board of directors in board meetings held in November 2007 in March 2008. According to Terra, had NYLIM disclosed this information, the board would have altered Terra's investment approach regarding its equity holdings (which, as Terra emphasizes, consisted solely of NYLIM proprietary funds). As a result, between two to three million dollars in realized losses would have been averted. At the center of Terra's claims are documents and testimony about an investment strategy implemented by New York Life — NYLIM's parent company —

1  called the "quality tilt." This strategy, which was implemented by New York Life in 2007,
2  shifted a small portion of New York Life's investment portfolio away from its "normal" credit-
3  market investments (BBB-rated bonds) towards "safe U.S. Treasury bonds" (Wall Decl. Exh. 59).
4  While New York Life and NYLIM are different entities, Terra asserts that the "quality tilt"
5  investment strategy originated from and/or was known to senior management and market analysts
6  at NYLIM, and therefore NYLIM violated the law by providing investment advice to Terra that
7  failed to reflect (and directly contradicted) the market outlook underlying the "quality tilt"
8  strategy.

These three events — Terra's board meetings in November 2007 and March 2008, and the development of New York Life's "quality tilt" strategy — are discussed in more detail below.

### 1. TERRA'S NOVEMBER 2007 BOARD MEETING

Well before Terra's November 2007 board meeting, Terra President and CEO David Coduto had specific concerns about the health of the economy and Terra's equity holdings in its investment portfolio (*see, e.g.*, Okcu Decl. Exh. 11 at 185, Exh. 6; Wall Decl. Exh. 12). In June 2007, Mr. Coduto met with Ms. Sabella and another NYLIM representative, Veda Pai-Panadiker, to discuss "the appropriate level of equities of an insurance company of [Terra's] size" and "issues . . . about the U.S. economy" (Okcu Decl. Exh.11 at 185; Exh. 12 at 103). During this meeting, Mr. Coduto's concerns regarding the credit markets — specifically, the commercial mortgage marketplace — were also supposedly discussed (*Id.* at Exh. 11 at 196–97).

Four months later, Mr. Coduto repeated his macroeconomic concerns at an October 2007 shareholder meeting. At that meeting, Mr. Coduto's specifically stated that he "predict[s] that the market will begin to unwind economically" and a "[b]ear market of epic proportions . . . will begin sometime between the end of this year and November 2008 elections" (*id.* at Exh. 11 at 213–216). Mr. Coduto's handwritten notes for the shareholder meeting also show that he had particular concerns about a "credit meltdown" and "massive world-wide debt" (*id.* at Exh. 6).[1] These opinions were all supposedly based upon Mr. Coduto's independent research (*id.* at 215).

---

[1] Defendant's objections on authentication and hearsay grounds are overruled without prejudice to renewal at trial. Mr. Coduto identified the handwritten notes as his own in his deposition, and can provide direct testimony at trial on this issue.

3

A number of these concerns became individual topics for discussion at Terra's November 2007 board meeting. Leading up to the November meeting, Terra provided NYLIM with official "discussion points" that would be addressed during NYLIM's presentation to the board, including "the current economy and its effect on investment decisions," whether Terra should "consider expanding [its] portfolio's [international] component" due to the observation that "[s]ome [i]nternational markets are booming," and whether Terra should "reduce or eliminate our equity exposure and stay in cash for the next year or so" (Wall Decl. Exh. 12). NYLIM's recommendations on these topics were expressly requested (*ibid.*)

The November 2007 board meeting was attended by NYLIM representatives Sabella and Pai-Panadiker (Wall Decl. Exh. 16). At the meeting, Mr. Coduto provided his views on the economy and asked NYLIM whether Terra should liquidate its equity portfolio (given current economic conditions) and then transfer the balance into cash and cash equivalents until the financial markets and overall economy stabilized (*ibid.*). According to Mr. Coduto, it was his recommendation to the board that Terra's equity portfolio be liquidated in this manner (Okcu Decl. Exh. 11 at 225). In response, Ms. Sabella told Terra's board that Mr. Coduto's approach was "conservative," that NYLIM market strategists felt that the U.S. economy was "fundamentally sound," and that Terra should "stay the course" (Wall Decl. Exh. 16; Okcu Decl. Exh. 11 at 231, Exh. 12 at 112, Exh. 18 at 124–25). The statement that the economy was "fundamentally sound" was one that numerous board members recalled Ms. Sabella making at the November board meeting (*see, e.g.*, Okcu Decl. Exh. 14 at 140, Exh. 17 at 90, Exh. 20 at 72).

With respect to Mr. Coduto's "discussion point" regarding international markets, Ms. Sabella recommended that Terra make new investments into NYLIM's proprietary ICAP international fund (*id.* at Exh. 16, Exh. 12 at 143, Exh. 17 at 95). Following NYLIM's presentation, the board decided to follow the recommendations of Ms. Sabella and maintain the company's investment guidelines (Wall Decl. Exh. 14). In short, Terra's equity holdings were *not* liquidated as recommended by Mr. Coduto. Rather, Ms. Sabella was authorized to make *new* equity investments in NYLIM proprietary funds (Okcu Decl. Exh. 16, Exh. 11 at 242, Exh. 17 at 97, Exh. 21 at 79).

4

### 2. TERRA'S MARCH 2008 BOARD MEETING

Due to the marked disagreement between Mr. Coduto and Ms. Sabella at the November 2007 board meeting, NYLIM was directed by Mr. Coduto and the board to use every resource to research Mr. Coduto's specific economic concerns before the next board meeting in March 2008 (*id.* at Exh. 11 at 231, Exh. 12 at 113–16). One reason for this directive was the fact that some board members and management, including Mr. Coduto, believed that Ms. Sabella failed to adequately address the "discussion points" about the economy raised at the November meeting. In response to Terra's request, Ms. Sabella offered to bring a "senior economist" to the March 2008 board meeting to address Terra's specific concerns (*id.* at Exh. 11 at 279–81, Exh. 17 at 90-91; Exh. 18 at 137). At least one Terra board member believed that the board refrained from liquidating the company's equity position in November 2007 so that the board could hear the opinions of the "senior economist" in March (*id.* at Exh. 17 at 97).

As promised, the managing director of NYLIM's Equity Investors Group, Bill Knapp, appeared and presented at Terra's March 2008 board meeting (Wall Decl. Exhs. 26, 28). The "discussion points" for NYLIM's presentation to the board were the same as those raised at the November 2007 board meeting. NYLIM was again asked whether Terra's equity investments were too high in light of the state of the economy and as compared to industry peers (*ibid.*). Also at the meeting, Mr. Coduto reaffirmed his recommendation to the board that Terra should reduce or completely liquidate its equity holdings based upon his belief that the country was in the beginning stages of a recession (Okcu Decl. Exh. 17 at 150–51; Wall Decl. Exh. 34). To support his recommendation, Mr. Coduto emphasized that Terra's equity portfolio had lost one million dollars in value since following NYLIM's advice in November (Okcu Decl. Exh. 11 at 288).

In contrast to Mr. Coduto's opinions about the economy, Mr. Knapp's presentation at the March 2008 meeting — as recalled by Terra board members — was nothing but positive with respect to housing, "cash on the sidelines," the weak dollar, and the economy in general (*id.* at Exh. 18 at 188, Exh. 19 at 94–95, Exh. 21 at 102–03). After his presentation, Mr. Knapp represented to Terra that "the worst was over" economically, that the market was still "fundamentally sound," and that Terra should stay in equities (*id.* at Exh. 11 at 287, Exh. 12 at

5

186–191, Exh. 17 at 161, Exh. 18 at 166–67). Ms. Sabella also supposedly stated that the market was "fundamentally sound" (*id.* at Exh. 17 at 159). Taken together, the message provided by NYLIM at the March 2008 board meeting was that the economy was in a mid-cycle slowdown but a recession would likely be averted (Br. 8; Wall Decl. Exh. 75 at 113–14).

Although Mr. Coduto believed that NYLIM had still not adequately addressed his specific points and concerns, Terra's board again followed NYLIM's recommendation to *not* liquidate its equity holdings (Okcu Decl. Exh. 11 at 289, 293, Exh. 17 at 163, 166; Wall Decl. Exh. 30). After the economy worsened considerably following the March 2008 board meeting, Terra's board members unanimously voted on November 4, 2008, to terminate its relationship with NYLIM (*id.* at Exhs. 51–52, 57). In an email dated November 10, 2008, Mr. Coduto directed NYLIM to liquidate all of its mutual fund holdings (*id.* at Exh. 53). The very next day, NYLIM provided written notice to Terra — pursuant to the parties' investment advisory agreement — terminating the relationship (*id.* at Exh. 54).

### 3. THE "QUALITY TILT" INVESTMENT STRATEGY

Shortly after its investment advisory relationship with NYLIM ended, Terra became aware of the "quality tilt" investment strategy employed by New York Life during 2007. The "quality tilt" strategy was disclosed publicly in a "special report" entitled "Investing for Strength and Safety." This special report was included as part of New York Life's 2007 annual report for its policyholders (*id.* at Exh. 59). The exact date this report was published is unclear from the record. The special report was authored by Gary Wendlandt, Chief Investment Officer and Vice Chairman of the Board at New York Life *and* Chairman of the Board of NYLIM (Okcu Decl. Exh. 22 at 5, 12). Mr. Wendlandt's dual-role in both NYLIM and New York Life is one of many thin threads holding Terra's legal claims together.

In the above-mentioned special report, Mr. Wendlandt stated that "in February 2007, New York Life management approved a proposal to divert a portion of the Company's investable cash flow from our normal credit market investments into U.S. Treasurys" (Wall Decl. Exh. 59 at NYLIM 4527). Other portions of the 2007 annual report echoed this statement, noting that "[m]ore than a year before the credit crisis emerged, New York Life's investment management

6

1    team, led by Chief Investment Officer Gary Wendlandt, began closely monitoring what they
2    believed to be an unfavorable market environment . . . call[ing] for temporarily allocating a larger
3    portion of the Company's investments into safe U.S. Treasury bonds" (*id.* at NYLIM 4522).

4          The "quality tilt" strategy was separately disclosed in an article published by New York
5    Life entitled "New York Life Avoids the Risks, Clients Reap the Rewards" (Okcu Decl. Exh. 7).
6    This article was dated February 2008. The article stated that "[t]hroughout 2006 and early 2007,
7    *the investment experts at NYLIM* noted several trends suggesting the prices of most debt securities
8    — including corporate bonds, which typically represent the lion's share of New York Life's
9    investment portfolio — did not adequately reflect the degree of market risk" (*ibid.*) (emphasis
10   added). In his deposition, Mr. Wendlandt admitted that at least *some* investment experts at
11   NYLIM had these beliefs (*id.* at Exh. 22 at 306–07). The article continued, "[i]n response,
12   NYLIM placed more of the Company's investments in traditionally safe, reliable U.S. Treasury
13   bonds and less in corporate debt" (*id.* at Exh. 7). Finally, the article noted that "Gary Wendlandt,
14   New York Life's Vice Chairman and Chief Investment Officer, called the subsequent move a
15   'quality tilt,' because it would position the Company away from what they perceived as an
16   unhealthy level of risk" (*ibid.*).

17         While the February 2008 article appears to credit NYLIM "investment experts" with the
18   origins of the "quality tilt" strategy, other evidence — including the 2007 annual report —
19   implies that Mr. Wendlandt alone conceived of the idea. According to Mr. Wendlandt's
20   deposition testimony, he began to have concerns in the fall of 2006 that "there was too much easy
21   credit available to fund projects . . . [and] too much money to put that money in a productive way
22   to work" (*id.* at Exh. 22 at 231). These concerns culminated in his drafting of a New York Life
23   interoffice memo in January 2007 setting forth the "quality tilt" investment strategy (*id.* at Exhs.
24   2–4). After a number of revisions, this memo was sent to various New York Life *and* NYLIM
25   personnel, including the head of the Portfolio Consulting Group at NYLIM, the managing
26   director of the Portfolio Consulting Group at NYLIM, the senior vice president of NYLIM, and
27   the head of NYLIM's Investment Consulting Group (*ibid.*; *id.* at Exh. 22 at 252–56).
28

7

1  In sum, while the record is unclear as to the origin of the "quality tilt" strategy, there is
2  evidence that at least *some* NYLIM analysts shared Mr. Wendlandt's concerns about the credit
3  markets and that high-ranking employees at NYLIM were aware of the "quality tilt" strategy.

\*           \*           \*

Terra filed this action on April 13, 2009. Seven claims were asserted: (1) fraudulent misrepresentation, (2) fraudulent concealment, (3) negligent misrepresentation, (4) breach of fiduciary duty, (5) breach of contract, (6) breach of the implied covenant of good faith and fair dealing, and (7) negligence (Dkt. No. 1). All of these claims focus upon the events set forth above, plus an additional "contract abandonment" allegation explained further in this order.

The only prior motion of substance in this action was a motion to dismiss, which was denied on July 31, 2009 (Dkt. Nos. 15, 43). The instant motion was heard on May 6, 2010.

**ANALYSIS**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In resolving a summary judgment motion, all reasonable inferences must be drawn in the light most favorable to the non-moving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

The seven claims asserted by Terra all involve the following general allegations: NYLIM representatives Sabella and Knapp intentionally misrepresented (or represented negligently and without a reasonable basis) to Terra board members and management that the economy was "fundamentally sound" and that Terra should therefore *not* liquidate or reduce its equity holdings in NYLIM proprietary funds. At the time these misrepresentations were made, Sabella and Knapp knew (or should have known) that the opinions and recommendations they provided were contrary to what NYLIM analysts had already concluded. Upon hearing NYLIM's advice, Terra's board members — who were mostly engineers — reasonably relied upon the

8

1 recommendations of its investment advisor and, contrary to the advice of Terra President and
2 CEO David Coduto, maintained Terra's holdings in NYLIM proprietary funds. As a result,
3 Terra's equity holdings declined significantly in value.

4 Acknowledging that the evidence produced by plaintiff is barely sufficient to survive
5 summary judgment on many of the above allegations, this order nevertheless finds, viewing all of
6 the evidence in a light most favorable to Terra, that genuine issues of material fact exist as to all
7 seven of Terra's claims.

### 1. MISREPRESENTATION CLAIMS

Three misrepresentation claims have been asserted by Terra in this action: (1) fraudulent misrepresentation, (2) fraudulent concealment, and (3) negligent misrepresentation.

### A. Fraudulent Misrepresentation and Fraudulent Concealment

The elements of fraudulent misrepresentation are: (1) the defendant misrepresents material facts; (2) with knowledge of the falsity of the representations or the duty of disclosure; (3) with intent to defraud or induce reliance; (4) which induces justifiable reliance by the plaintiff; (5) to his or her detriment. *Hahn v. Mirda*, 147 Cal. App. 4th, 740, 748 (2007). Similarly, the elements of fraudulent concealment are: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Lovejoy v. AT&T Corp.*, 119 Cal. App. 4th 151, 157–58 (2004).

With respect to these two claims, this order finds that Terra has met (albeit barely) its evidentiary burden of showing a genuine issue for trial. Viewing the evidence in a light most favorable to Terra, a reasonable jury could find that Terra President and CEO David Coduto communicated specific concerns — including concerns related to credit and debt markets — to NYLIM as early as June 2007. These concerns focused on the health of the economy and "the appropriate level of equities of an insurance company of [Terra's] size" in light of NYLIM's

9

1 market outlook (Okcu Decl. Exh.11 at 185; Exh. 12 at 103). These concerns were reiterated
2 (indeed, expressly spelled out as "discussion points") at both the November 2007 and March 2008
3 board meetings (Wall Decl. Exhs. 12, 26).

4 Putting an entirely different gloss on the state of the economy, NYLIM representative
5 Sabella told Terra's board members at the November 2007 board meeting that the economy was
6 "fundamentally sound" and that they should "stay the course" and maintain their equity holdings
7 in NYLIM's proprietary funds (*id.* at Exh. 16; Okcu Decl. Exh. 11 at 231, Exh. 12 at 112, Exh. 14
8 at 140, Exh. 17 at 90, Exh. 18 at 124–25, Exh. 20 at 72). The same representations were repeated
9 at the March 2008 board meeting by both Ms. Sabella and Mr. Knapp, who had been brought in
10 by NYLIM *specifically* for his special expertise in addressing the "discussion points" raised by
11 Mr. Coduto (*id*. at Exh. 11 at 287, Exh. 12 at 186–191, Exh. 17 at 159–161, Exh. 18 at 166–67).
12 Indeed, Ms. Sabella informed Terra board members that Mr. Knapp was specially qualified to
13 provide investment opinions on issues pertaining to Terra's equity portfolio (*id*. at Exh. 17 at 97).
14 Since NYLIM had a financial "stake" in whether Terra remained invested in its proprietary funds,
15 a jury could reasonably infer that this advice was motivated by an intent to keep Terra from
16 liquidating its holdings.

17 Finally, given the fact that NYLIM had been specifically hired to provide investment
18 advice to Terra's board (which consisted primarily of engineers who would have no reason to
19 question such advice), a reasonable jury could find that Terra board members reasonably relied on
20 the representations made by Ms. Sabella and Mr. Knapp when deciding to maintain their equity
21 holdings in NYLIM's proprietary funds. Indeed, there is ample evidence — at least to survive a
22 motion for summary judgment — that had these representations *not* been made by NYLIM, the
23 board would have followed Mr. Coduto's advice and liquidated its equity holdings in November
24 2007 or March 2008 (*see, e.g.*, *id.* at Exh. 11 at 356–57, Exh. 12 at 257, Exh. 17 at 203, Exh. 20 at
25 158–63, Exh. 21 at 169–72). As a result of this reliance, the value of Terra's equity holdings fell
26 between two to three million dollars.

27 NYLIM raises a number of strong arguments. None, however, is sufficient to prevail at
28 summary judgment. *First*, NYLIM claims that the representations allegedly made by Ms. Sabella

10

1 and Mr. Knapp are not actionable because they are statements of "opinion" that cannot form the
2 basis of a misrepresentation claim (Br. 19). This issue has already been decided (Dkt. No. 43 at
3 6–7). As explained in the order denying defendant's motion to dismiss, when "a party possesses
4 or holds itself out as possessing superior knowledge or special information or expertise regarding
5 the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed
6 knowledge, information, or expertise, the defendant's representation may be treated as one of
7 material fact." *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 308
8 (2000). Furthermore, "circumstances resulting in expressions of opinion being treated as
9 misrepresentations have been found where the one expressing the opinion does not in fact
10 entertain it." *Pacesetter Homes, Inc. v. Brodkin*, 5 Cal. App. 3d 206, 211 (1970). These rules
11 clearly apply here.

12 *Second*, defendant argues that the alleged non-disclosures would not have swayed the
13 board's decision regarding the liquidation of Terra's equity portfolio. This argument — which
14 speaks to reliance and materiality — is inherently factual. Viewing the evidence in a light most
15 favorable to Terra, the record shows that Mr. Coduto passionately advocated the liquidation of
16 Terra's equity holdings leading up to the November 2007 board meeting. This recommendation
17 was amplified at the March 2008 board meeting. Additionally, numerous board members testified
18 that they would have followed Mr. Coduto's advice and liquidated Terra's equity holdings but-for
19 the contrary advice provided by NYLIM (*see, e.g.*, *id.* at Exh. 11 at 356–57, Exh. 12 at 257, Exh.
20 17 at 203, Exh. 20 at 158–63, Exh. 21 at 169–72). While the testimony of these board members
21 may be tainted by hindsight, it is the jury's role to weigh such issues of credibility.

22 *Third*, NYLIM devotes pages of argument to the origins of New York Life's "quality tilt"
23 investment strategy. This too involves factual issues for the jury to decide. While the evidence
24 might show that Mr. Wendlandt drafted the "quality tilt" memo, there are genuine issues as to the
25 role NYLIM analysts and "investment experts" played in its development (*see*, *e.g.,* Okcu Decl.
26 Exh. 7). Indeed, the February 2008 article published by New York Life outright *touted* that
27 "[t]hroughout 2006 and early 2007, the investment experts at NYLIM noted several trends
28 suggesting the prices of most debt securities — including corporate bonds, which typically

11

1 represent the lion's share of New York Life's investment portfolio — did not adequately reflect
2 the degree of market risk" (*ibid.*). Viewing this statement in a light most favorable to Terra, a
3 reasonable jury could easily find that the market analyses underlying the "quality tilt" strategy
4 were conducted by NYLIM analysts in 2006 and 2007, were available to *and known to* Ms.
5 Sabella and Mr. Knapp at the time they made their representations to Terra, and therefore should
6 have been disclosed to Terra at the November 2007 and March 2008 board meetings.

On this point, one clarifying point must be made. This order does *not* hold that NYLIM had a duty to disclose confidential information to Terra about the investment strategies being implemented by New York Life or any of its other clients. Rather, this order is focused squarely on relevant market research that was conducted by NYLIM analysts and used by its strategists to render advice to clients. Such research would certainly include, viewing the evidence in a light most favorable to Terra, the "trends suggesting the prices of most debt securities . . . did not adequately reflect the degree of market risk" known to NYLIM analysts in 2006 and 2007. Crediting Ms. Sabella and Mr. Knapp with this knowledge, a reasonable jury could find that the repeated statements by NYLIM analysts to Terra that the economy was "fundamentally sound" was materially inconsistent with their knowledge about credit markets.

*Fourth*, NYLIM argues that the health of credit markets was irrelevant as a matter of law to any investment advice provided to Terra pertaining to its equity portfolio (Br. 16). Stated differently, defendant argues that the "concerns" underlying the implementation of New York Life's "quality tilt" had no relation to the "discussion points" about the economy raised by Mr. Coduto. While this argument is compelling, whether equity and credit markets are "linked" is not a question of law that this order can resolve. Rather, it is an issue of fact for a jury to decide.[2]

*Fifth*, defendant argues that there is no evidence that Ms. Sabella or Mr. Knapp made knowingly false statements or knowingly concealed material information. This order disagrees.

---

[2] Both sides have put forth expert testimony on whether credit markets and equity markets are interrelated and whether the liquidation of Terra's equity holdings would have been consistent with Terra's long-term investment strategies. In other words, the question of materiality is greatly disputed. With respect to Terra's proffered expert on this issue, defendant's evidentiary objections are **DENIED WITHOUT PREJUDICE** to renewal at trial. Defendant has not put forth a sufficiently developed argument as to why the Nettesheim Report should be excluded on qualification and reliability grounds.

12

1 New York Life's February 2008 article stated that NYLIM analysts were aware of the trends
2 underlying the "quality tilt" report in 2006 and 2007. Viewing this evidence in a light most
3 favorable to Terra, a reasonable jury could find that Ms. Sabella and Mr. Knapp — who were
4 supposed to be rendering investment advice based upon the input of NYLIM analysts and
5 strategists — had actual knowledge of this information and either knowingly failed to disclose it
6 or intentionally provided *contrary* information to induce Terra to remain invested in NYLIM's
7 proprietary funds. At the very least, a reasonable jury could find that Ms. Sabella and Mr. Knapp
8 had no reasonable basis for stating that the economy was "fundamentally sound."

9 For these reasons, defendant's motion as to fraudulent misrepresentation and fraudulent
10 concealment must be **DENIED**.

11 **B.     Negligent Misrepresentation**

12 Negligent misrepresentation does not require an intent to defraud. Rather, to state a claim
13 for negligent misrepresentation, the defendant must have made the representation without any
14 reasonable ground for believing it to be true. *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454,
15 475–76 (2003). As just mentioned in the previous section, a reasonable jury could find that Ms.
16 Sabella and Mr. Knapp had no reasonable basis for stating that the economy was "fundamentally
17 sound." Accordingly, NYLIM's motion with respect to the negligent misrepresentation claim
18 must also be **DENIED**.

19 **C.     Imputed Knowledge**

20 While this order denied summary judgment as to Terra's misrepresentation claims based
21 upon circumstantial evidence that Ms. Sabella and Mr. Knapp *did in fact* know about the market
22 analyses and trends underlying the "quality tilt" strategy, a different legal question would be
23 presented if the jury found that Ms. Sabella and Mr. Knapp had no personal knowledge of this
24 information. Assuming Ms. Sabella and Mr. Knapp lacked this knowledge, Terra proposes a
25 theory of liability that is unsupported. In short, Terra proposes to hold NYLIM liable for
26 misrepresentation even if Ms. Sabella and Mr. Knapp had no knowledge as to why their
27 statements were "false" or "without a reasonable basis." Instead, Terra would point to a different
28 group of NYLIM employees (*e.g.*, Mr. Wendlandt and other "higher-ups" in NYLIM's chain of

13

1  command) to supply the requisite "knowledge of falsity." This is a half-baked argument that
2  Terra supports with no published decisions.[3] While Terra attempts to justify this theory by
3  turning common agency principles on their head and grafting them onto snippets of corporate
4  law, the undersigned is not yet convinced that this theory holds water. At trial, both sides will be
5  given a second opportunity to brief this particular issue.

6  **2.  BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS**

7  With respect to Terra's breach of fiduciary duty claim, both sides agree that NYLIM's
8  relationship with Terra was fiduciary in nature (Br. 13; Opp. 13–14). Pursuant to this duty,
9  NYLIM had a duty to disclose any material information relevant to its investment advice. *See*
10  *Twomey v. Mitchum, Jones, & Templeton, Inc.*, 262 Cal.App.2d 690, 709–715 (1968). As noted
11  earlier, however, this does *not* necessarily include a duty to disclose confidential information
12  about the investment activities of other clients.

13  Nevertheless, numerous factual issues exist for this claim. *First,* as already discussed in
14  detail, there are genuine issues of fact as to the role NYLIM analysts and "investment experts"
15  played in developing the "quality tilt" strategy, including any general market research that formed
16  the basis for the strategy (*see*, *e.g.,* Okcu Decl. Exh. 7). *Second*, given this evidence, a reasonable
17  jury could find that these analyses should have been made known to Terra in 2007 and 2008,
18  either because Ms. Sabella and Mr. Knapp knew this information or because they should have
19  known about it. *Third*, there are genuine issues whether this information was relevant to
20  NYLIM's investment advice — namely, whether credit concerns were sufficiently "linked" to
21  Mr. Coduto's concerns about Terra's equity holdings and whether Terra's board would have
22  voted to liquidate its equity portfolio had they been informed of this information. *Fourth*, there is
23  sufficient evidence in the record for a reasonable jury to find that NYLIM "abandoned" its

---

[3] The one published decision cited by Terra merely states that a principal may be held liable where he or she intentionally misinforms or withholds information from an agent who in turn makes a misrepresentation *See Barrett v. Bank of America*, 183 Cal. App. 3d 1362, 1370 (1986). There is no evidence, circumstantial or otherwise, to support such a theory in this case. The only other authority cited by Terra is an unpublished Northern District of California decision dealing solely with *negligent* misrepresentation. *Gilberd v. Dean Witter Reynolds, Inc.*, 1992 WL 880089 (N.D. Cal. 1992) (Henderson, J.). That case relied not upon California law for its ruling, but on the Restatement Second of Agency. As such, it provides only marginal support to plaintiff's argument.

1 fiduciary duties to Terra in September 2008 (approximately one month prior to the termination of
2 their relationship) (*id.* at Exh. 11 at 319–20).

3 For these reasons, NYLIM's motion for summary judgment with respect to Terra's breach
4 of fiduciary duty claim is **DENIED**. Since analogous allegations support Terra's negligence claim,
5 NYLIM motion with respect to Terra's claim of negligence must also be **DENIED**.

### 3. CONTRACT-RELATED CLAIMS

Both sides devote few words to Terra's claims for breach of contract and breach of the covenant of good faith and fair dealing (Br. 22; Opp. 23). As alleged in the complaint, Terra's breach of contract claim is predicated on the accusation that NYLIM "fail[ed] to pursue the Agreement's stated Investment Objective, advising Terra to maintain its equity position in NYLIM funds and to purchase additional securities at a time when NYLIM knew that such a strategy was inconsistent with Terra's Investment Objective and contrary to its own conclusion. NYLIM further breached the Agreement by abandoning the relationship, refusing to perform its contractual duties, and ignoring Terra's requests for investment advice" (Compl. ¶ 90). The allegations underlying the implied covenant claim are substantially similar (*id.* at ¶ 97).

For the reasons discussed above, a reasonable jury could find — viewing the evidence in a light most favorable to Terra — that NYLIM's advice was motived by fraudulent intent and was therefore inconsistent with the terms of the contract requiring NYLIM to provide advice pursuant to Terra's investment objectives. Additionally, there is sufficient evidence — at least to survive summary judgment — that NYLIM abandonment the contract in late 2008. These allegations, as well as all of the allegations discussed earlier in this order, also support Terra's implied covenant claim. Accordingly, NYLIM's motion with respect to Terra's claims for breach of contract and breach of the implied covenant of good faith and fair dealing must be **DENIED**.

### 4. PUNITIVE DAMAGES CLAIM

As a bookend to its brief, NYLIM argues that Terra cannot demonstrate "by clear and convincing evidence" that it is entitled to punitive damages because no reasonable juror could find, based upon the evidence in the record, that NYLIM acted with "fraud, oppression or malice" (Br. 22). *See* Cal. Civ. Code § 3294(a). At summary judgment, "[t]here is no genuine issue if the

1 evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a
2 rational finder of fact to find actual malice by clear and convincing evidence." *See Anderson v.*
3 *Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

This order agrees. While the evidence presented by Terra may be sufficient to survive summary judgment on its claims sounding in fraud (applying a preponderance of the evidence standard), the evidence is not of sufficient caliber or quantity (even when viewed in a light most favorable to Terra) to allow a rational finder of fact to find actual malice *by clear and convincing evidence*. Indeed, Terra has produced no *direct* evidence that Ms. Sabella or Mr. Knapp knew anything about the "quality tilt" strategy or had any intent to commit fraud. Rather, scienter is supported only by *circumstantial* evidence. Moreover, as mentioned numerous times in this order, the evidence on these elements was only *barely* sufficient to survive NYLIM's summary judgment motion (under a burden of proof less stringent than the "clear and convincing" standard). For these reasons, NYLIM's motion with respect to punitive damages is **GRANTED**.

**CONCLUSION**

For the reasons set forth above, NYLIM's motion with respect to Terra's claim for punitive damages is **GRANTED**. The motion with respect to all remaining claims is **DENIED**. NYLIM's motion for judicial notice and all evidentiary objections *not* ruled on in this order are **DENIED WITHOUT PREJUDICE** to renewal at trial. One final caveat must be added. After denying a defense summary judgment motion, the undersigned has occasionally found that the trial record falls short of the summary judgment record and a Rule 50 motion is warranted. Sometimes a witness refuses to go as far at trial as he or she did in a deposition. Sometimes evidentiary objections make a difference. Where, as here, the overall case is borderline and defendants have raised many evidentiary objections, the potential for such an outcome is heightened. As such, counsel should not take anything for granted and both sides should be mindful of Rule 50.

**IT IS SO ORDERED.**

Dated: May 11, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE